BALLESTER BROS., Plaintiff and Appellee, *v.* CARSTENS PACKING Co., Defendant and Appellant.

No. 5577. Argued November 25, 1931.—Decided July 22, 1932.

*Hartzell, Kelley & Hartzell,* and *F. Ramírez de Arellano,* for appellant. *Molina, Dubón & Ochoteco,* for appellee.

MR. JUSTICE HUTCHISON delivered the opinion of the Court.

Plaintiff, hereinafter designated as Ballester, obtained a judgment against defendant, hereinafter referred to as Carstens, for damages arising out of a breach of contract. The main question is what was the contract between the parties or, more specifically, whether there was any novation or modification of the original contract.

The original contract was for the purchase of a certain quantity of lard to be sent in three shipments, one within the first half of September, another during the latter half of September, and a third during the first half of October. On October 4, Ballester cabled Carstens requesting explanation of a cable received from Carstens and making inquiry concerning the sailing date from Tacoma of the shipment, if any had been made, during the latter part of September. On October 5, Carstens answered, "Second lot shipped Steamer Chas. McCormick September twenty-eighth steamer now in dry dock Seattle will arrive San Juan about November fourth sailing from Seattle about October fifteenth if buyers going to refuse lard account of delay in shipping we must know immediately so can divert shipments regret this occurrence." On October 8, Ballester cabled Carstens to divert one thousand cases and to stop further shipments. Other cables follow in chronological order. October 11, Carstens to Ballester: "Charles McCormick sailing thirteen have unloaded thousand cases shall we ship six hundred two thirty sevens three hundred one fifties on this steamer which is second half September shipment your order September seventh Stop Shall we ship first half October same order nine hundred cases this steamer Answer quick." October 11th, Ballester to Carstens: "Understand McCormick bringing one thousand 2/37 Ship same steamer Mayagüez total ninehundred lithographed 1/50 thirteen dollars exactly alike samples received Stop Telegraph sailing date next steamer." October 15th, Ballester to Carstens: "Very disappointed. Why do you not reply?" October 16, Carstens to Ballester: "Shipped thousand cases two thirtyseven nine hundred cases onefifty Stop Next steamer due leave Tacoma October twentyfifth." November 13, Ballester to Carstens: "Surprised McCormick arrived without shipments on this ground buyers have canceled Stop Bank advises documents indicate goods coming steamer Hauptman which sailed beyond contract time." November 16 Carstens to Ballester: "Hauptman was first

steamer to load at Tacoma we did best possible therefore expect you accept shipment." November 18, Ballester to Carstens: "Very sorry but buyers reject shipments your cables October fifth eleventh specified McCormick which was scheduled second half September Tacoma. Hauptman never mentioned otherwise we had stopped shipments."

Carstens had set up by way of defense that it had obtained space on the *Charles McCormick* which was expected to sail from Tacoma October 13 for 2,900 cases of lard; that this steamer was in dry dock at Seattle and was to arrive in San Juan about November 4; that Carstens then cabled the inquiry as to whether Ballester would refuse to accept the lard on account of the delay in shipment and that Ballester thereupon refused the order; that Carstens immediately reduced the reservation of space for twenty-nine hundred cases to a reservation for nineteen hundred cases and as a result of this reduction it became impracticable for the *Charles McCormick* to touch at Tacoma; that in order to avoid unnecessary delay shipment was made by the *Hauptman* which was then loading at Tacoma and was due to sail at about the same time as the *McCormick* and did sail for Puerto Rico on October 13; that the *Hauptman* and the *McCormick* both arrived in San Juan during the month of November with a difference of only six days between the dates of their respective arrivals; that as the *McCormick* was in dry dock, both the steamship company and Carstens thought that the *Hauptman* would be the first to arrive in Puerto Rico and that this was the reason why Carstens did not cable Ballester concerning the change as to the vessel by which the shipment had been made.

Practically the only evidence in support of these averments was the information contained in the cables introduced by plaintiff. Full proof could hardly have affected the result. The facts alleged in the answer, however, throw an interesting side light on the cables. That Carstens, after learning that the *McCormick* would not touch at Tacoma, attempted in good faith to carry out the contract, as far as was then pos-

sible, may be conceded. Nevertheless, Carstens had not informed Ballester and did not then inform Ballester that space had been reserved on the *McCormick* for 2,900 cases, nor that the space so reserved had been reduced to space for 1,900 cases, nor that owing to a change in the *McCormick's* itinerary the shipment would be made on the *Hauptman.* The assurance which had been given Ballester was that Carstens had shipped the second lot of lard September 28 on the *Charles McCormick,* which had gone into dry dock at Seattle but would sail from Seattle on October 15, and was due to arrive in San Juan about November 4. This was followed by the statement that Carstens had unloaded one thousand cases and that the *McCormick* would sail on October 13. This statement was coupled with an inquiry as to whether Carstens should make an additional shipment by the same steamer and a request for immediate answer. Ballester immediately cabled his understanding that the *McCormick* was bringing a specified shipment and gave an additional order for transportation and delivery at Mayagüez by the same steamer. This cable remained unanswered for a period of four days. Ballester then expressed disappointment and asked for an explanation of the delay in reply. Even then Carstens did not explain nor correct the false impression given Ballester but was content to say that 1,900 cases had been shipped. Ballester who had accepted this shipment represented by Carstens as having been made September 28 on the *McCormick,* had every reason to believe that the lard would be available for delivery to his customers on arrival of the *McCormick* in San Juan. The unsuccessful attempt by shipping on another steamer to deliver the lard in San Juan on or before the arrival of the *McCormick* was neither the performance of a contract for such delivery nor a sufficient excuse for nonperformance.

The shipping date was an important feature of the original contract. That contract was modified by Ballester's acceptance of a shipment said to have been made September 28 on

a steamer the sailing of which had been delayed by its going into dry dock. Thereupon the time element of the contract shifted from the date of shipment specified in the original contract to the date of the *McCormick's* arrival in San Juan. The new obligation assumed by Carstens was to deliver the lard in San Juan on or before the arrival of the *McCormick*, if not by the *McCormick*. If any sailing date was then involved, it was the sailing date of the *McCormick*. Time was still of the essence of the contract, but the important feature now was the date of the delivery in San Juan to be determined by the date of the *McCormick's* arrival. The date of performance, if attempted by any other steamer, was the date of the *McCormick's* arrival in San Juan, not the sailing date nor the date of arrival of such other steamer. The new contract, or the original contract as modified, if not a contract for delivery by the *McCormick* on arrival in San Juan, was at least a contract for delivery in San Juan on or before the date of such arrival. The failure to deliver on or before that date either by the *McCormick* or by any other vessel was a breach of the contract.

If the district court erred, as claimed by appellant, in holding that the contract was for shipment by the *Charles McCormick* on October 13, the error was harmless. The court did not err, as appellant also insists, in holding that defendant failed to carry out its contract when it shipped the lard by the steamer *Hauptman* which sailed five or six days after the *McCormick*.

Another contention is that the district court erred in rendering judgment for plaintiff without proof of damages nor the amount thereof. Francisco Ballester with papers in his hands testified that his firm had sold all of the lard in question at a profit before the arrival of the *McCormick*, and that the damages amounted to $769.01. He was not cross-examined but later testified as a witness for defendant that he refused to accept the lard on arrival of the *Hauptman* because his customers had refused to accept the later delivery by his

firm; that the drop in price did not affect him because he had bought and sold; and that it was not he but the people who had bought from him who would have lost by the fall or profited by a rise in the market. The credibility of this witness was a question for the trial judge who accepted the testimony as true. We can not concur in the view that corroboration by introduction of the contracts which the witness said he had with him at the time or by the calling of the customers referred to by him was necessary in order to make out a prima facie case. Loss of profits from sales already made for delivery on arrival of the *Charles McCormick* was a proper measure of damages. See section 1059 of the Civil Code (Revision of 1930); *Fernández* v. *Ortiz,* 33 P.R.R. 6; *Barr* v. *Henderson,* 105 La. 691, 30 So. 158.

The error, if any, committed by the trial judge in his statement of the case and opinion by saying that the denials contained in the answer were not specific, and by not paying proper attention to certain evidence tending to show that the *Charles McCormick* had gone into dry dock because of a broken rudder, was not reversible error.

The judgment appealed from must be affirmed.

Mr. Justice Córdova Dávila took no part in the decision of this case.